Mr. Justice Miller
delivered the opinion of the court:
The plaintiffs made an agreement, in the year eighteen hundred and forty-three, with persons representing a branch of the Cherokee tribe of Indians, called the Western Cherokees, to prosecute a claim which the Indians set up against the United States. It was a part of the agreement that plaintiffs were to receive, directly from the United States, ñve per cent, upon all sums that might be collected on the claim. The plaintiffs allege that they rendered faithful and valuable assistance in prosecuting the claim, and that it resulted in a treaty, and a corresponding act of appropriation by Congress, by which the tribe received over §800,000. As the case was decided on demurrer, or what is equivalent to a demurrer, these and other statements must be taken to be true. They show a faithful and laborious performance of their contract by the plaintiffs, for which no compensation was ever received.
The treaty which provided for this claim of the Indians, as finally ratified by the Senate and by the tribe, jirovided that the sum of money found due should 'be held in trust by the United States and paid out to each individual Indian, or head of a family, and that this per capita allowance should not be assignable, but should be paid directly to the person so entitled. This was in 1846. On the 30th of September, 1850, Congress made an appropriation of the amount necessary to fulfill this treaty, and the act contained a provision that no part of the money should be paid to any agent of said Indians, or to any other person than the Indian to whom it was due.
It is insisted by plaintiffs, that because the Government of the United States was aware of the contract between them and the Indians, and failed to reserve and pay over to them the five per cent, which, by that contract, they had a right to claim of the Indians, the United States is liable to them for the amount.
It is supposed that the doctrine of an equitable assignment of a debt or fund due from one person to another, by the order of the creditor to pay it to a third party, when brought to the notice of the debtor, is a sufficient foundation for the claim. *35 But, if we concede that the Government is to be treated in the present case precisely as a private individual, it is not easy to see how that doctrine can be made to apply. The debt or fund as to which such an equitable assignment can be made, must be some recognized or definite fund or debt, in the hands of a person who admits the obligation to pay the assignor; or, at least, it must be some liquidated demand, capable of being enforced in a court of justice. We-apprehend that the doctrine has never been held, that a claim of no fixed amount, nor time, or mode of payment; a claim which has never received the assent of the person against whom it is asserted, and which remains to be settled by negotiation or suit at law, can be so assigned as to give the assignor an equitable right to prevent the original parties from compromising-or adjusting the claim on any terms that may suit them.
That is just what is claimed in this case. For it is very clear that if this equitable claim in the hands of plaintiffs was not effectual before the treaty, it can have no effect afterward.
The treaty, by its terms, is incompatible with the claim of plaintiffs. None of the money could be paid to plaintiffs if all of it was to be paid to the Indians individually, in proportions to be determined by their numbers.
This principle of paying to the Indians per capita was not adopted with any reference to plaintiffs’ claim as a means of exclusion. The treaty was made with the entire tribe of Cherokees, of which these Western Ckerokees were but a small part; and the claims which they were urging on our Government constitute a still smaller part of the matters settled by the treaty.
Land claims were adjusted, the difficulties between this branch and the main body of the tribe were arranged. Other payments were made to the main tribe in which the rule of paying per capita was adopted. Now, the argument assumes that unless in adjusting all these important interests the United States kept in view the sum to be paid to plaintiffs, by their contract with the Indians, and provided for it, they must either make no treaty at all, or must pay their claim. It cannot be permitted that by contracting with other parties, without requiring or asking the consent of the Government, any one can establish such a right to control the action of that Government in making treaties or contracts.
*36 The claim of the Western Indians was nothing more than a claim prior to the treaty. Its justice had never been admitted.. Its amount was uncertain. These, together with the mode of payment, were all unsettled, and open, to negotiation. Is it possible that, by making a contract with claimants to prosecute this demand against the Government, the plaintiffs thereby acquired such a hold on that Government as not only made the claim good to that extent, bat prevented it from compromising or settling with the claimants on the best terms to be obtained ¶
We have no hesitation in saying that the United States, under the circumstances, had the right to make the treaty that was made, without consulting plaintiffs, or incurring any liability to them. The act of Congress which appropriated the money only followed the treaty in securing its payment to the individual Indians, without deduction for agents. And both the act and t'he treaty are inconsistent with the payment of any part of the sum thus appropriated to plaintiffs.
The judgment of the Court of Claims, rejecting the demand, is therefore Apeirmed.